UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF KENTUCKY
LOUISVILLE DIVISION
CIVIL ACTION NO. 3:16-CV-00352-GNS

COGAN IMPORTS, INC.                                                                    PLAINTIFF

v.

SUNIL DHAROD                                                                            DEFENDANT

## MEMORANDUM OPINION AND ORDER

This matter is before the Court on Defendant's Motion for Summary Judgment (DN 59), Plaintiff's Motion for Summary Judgment (DN 53), Plaintiff's Motion to Exclude the Defendant's Expert Witness (DN 52), Defendant's Objection to Magistrate Judge's Order on Motion for Sanctions (DN 82), and Defendant's Objection to Plaintiff's Bill of Costs (DN 83). For the reasons set forth below, Defendant's Motion for Summary Judgment is **GRANTED**, Defendant's Objection to Magistrate Judge's Order on Motion for Sanctions is **OVERRULED**, Defendant's Objection to Plaintiff's Bill of Costs is **SUSTAINED**, and the other motions are **DENIED**.

### I.  STATEMENT OF FACTS

Kevin Cogan ("Cogan") collects luxury cars and established Plaintiff Cogan Imports, Inc. ("Cogan Imports"), a licensed motor vehicle dealer in Louisville, Kentucky. (Cogan Aff. ¶ 3, DN 21-2; Cogan Dep. 119:15-120:10, Sept. 27, 2017, DN 63-1; Def.'s Mot. Summ. J. Ex. 2, at 3, DN 59-3). Cogan was seeking financing for Cogan Imports' inventory and contacted Todd McNeill ("McNeill"), a loan broker with whom Cogan had dealt previously. (Cogan Aff. ¶ 4; McNeill Dep. 11:18-22, Jan. 24, 2018, DN 63-3). McNeill indirectly learned of Defendant Sunil Dharod

("Dharod"), who himself collected high-end cars, as a possible source of financing for Cogan Imports. (McNeill Dep. 12:15-13:9).

On February 26, 2016, Cogan, McNeill, and an associate of Dharod's named John Fox ("Fox") held a conference call in which they discussed Cogan's background and some of the cars in his collection. (McNeill Dep. 27:15-28-6). At some point, Cogan disclosed that he owned a 2003 Ferrari Enzo. (Fox Dep. 26:23-27:23, Nov. 2, 2017, DN 63-4). Fox later mentioned the Enzo to Dharod, and Dharod asked Fox to find out if Cogan Imports was interested in selling the vehicle. (Dharod Dep. 80:7-18, Dec. 7, 2017, DN 63-5).

Fox sent an email to Cogan asking whether he would be interested in selling the Ferrari, stating: "We would like to offer you $2.7 million for the Enzo." (Def.'s Mot. Summ. J. Ex. 9, at 4, DN 59-10 [hereafter Mar. 11 Emails]). Fox further indicated that if that price were agreeable to Cogan, Fox and Dharod would schedule a trip to Louisville "to spend a day going over details on that vehicle and other opportunities." (Mar. 11 Emails, at 4). Cogan responded, stating that he believed a meeting was important and asking the earliest possible date for a visit to Louisville. (Mar. 11 Emails, at 3-4). Cogan also inquired whether the offer of $2.7 million was a "formal offer" and provided an overview of the Enzo's history. (Mar. 11 Emails, at 3-4). Fox replied to Cogan's email, confirming that the prior email was a formal offer. (Mar. 11 Emails, at 3). Cogan responded, "I am accepting the offer. We have a deal." (Mar. 11 Emails, at 2-3).

The following day, Fox checked the history on the Enzo through Carfax and learned the car had over 4300 miles on it,[1] while Fox and Dharod previously understood the car's mileage to

---

[1] The emails from Fox variably express the mileage of the Enzo as 4300 and 4400 miles. (Def.'s Mot. Summ. J. Ex. 11, at 2, DN 59-12; Def.'s Mot. Summ. J. Ex. 12, at 2, DN 59-13).

2

be only 444.[2] (Fox Dep. 73:18-74:6; Def.'s Mot. Summ. J. Ex. 8, at 2, DN 59-9; Def.'s Mot. Summ. J. Ex. 11, at 2-3). The source of Fox's misunderstanding is unclear. In an email to McNeill, Fox blamed himself for the miscommunication on his poor hearing but indicated his notes from the teleconference reflected the lower mileage. (Def.'s Mot. Summ. J. Ex. 12, at 2). Fox testified he was confident Cogan had represented the lower mileage and that Fox initially took responsibility for the misunderstanding hoping to preserve good relations between Dharod and Cogan. (Fox Dep. 75:3-21; Def.'s Mot. Summ. J. Ex. 11, at 2-3).

After Dharod learned the Enzo's true mileage, Fox advised Cogan Imports that Dharod was no longer interested in purchasing the vehicle because of the mileage discrepancy. (Fox Dep. 74:7-12; Def.'s Mot. Summ. J. Ex. 10, at 2, DN 59-11). Cogan Imports subsequently took the position that the email correspondence with Fox represented a binding contract with no additional conditions. (Def.'s Mot. Summ. J. Ex. 13, at 2-4, DN 59-14). Dharod ultimately declined to purchase the Ferrari, and this litigation followed.

During the course of this action, the parties attempted to resolve the dispute and entered into a "Final Settlement Agreement" on July 15, 2016 ("Settlement Agreement"). (2d Am. Compl. ¶¶ 11-12, DN 16; Pl.'s Resp. Def.'s Mot. Summ. J. Ex. M, DN 67-14). The Settlement Agreement provided for an inspection of the vehicle on July 18, 2016, following which Dharod was to elect whether to proceed to close on the purchase or to terminate the Settlement Agreement "in which event the Parties shall resume the positions they held immediately before the Agreement was executed." (Pl.'s Resp. Def.'s Mot. Summ. J. Ex. M, at 2). Dharod allegedly objected to some

---

[2] According to Defendant's expert witness, the additional mileage dramatically impacts the value of the Enzo: a 2003 Enzo with around 400 miles would likely command a price similar to Dharod's initial offer of $2.7 million, whereas an Enzo with 4400 miles would be worth around $1.9 million. (Def.'s Expert Witness Discl., DN 52-3).

3

minor repairs costing approximately $1300. (2d Am. Compl. ¶¶ 14-15). Cogan Imports declined to make the repairs and Dharod terminated the Settlement Agreement. (2d Am. Compl. ¶¶ 15-16; Pl.'s Resp. Def.'s Mot. Summ. J. Ex. N, at 2, DN 67-15). Cogan Imports then relented and agreed to make the repairs, but Dharod declined to rescind his election to terminate the Settlement Agreement. (2d Am. Compl. ¶¶ 18-19). Cogan Imports subsequently amended its Complaint to assert a breach by Dharod of the Settlement Agreement. (2d Am. Compl. ¶¶ 9-24).

## II. JURISDICTION

This Court has subject-matter jurisdiction of this matter based upon diversity jurisdiction. *See* 28 U.S.C. § 1332.

## III. DISCUSSION

### A. Motions for Summary Judgment (DN 53, 59)

The parties have filed competing motions for summary judgment. In ruling on a motion for summary judgment, the Court must determine whether there is any genuine issue of material fact that would preclude entry of judgment for the moving party as a matter of law. *See* Fed. R. Civ. P. 56(a). The moving party bears the initial burden of stating the basis for the motion and identifying evidence in the record that demonstrates an absence of a genuine dispute of material fact. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). If the moving party satisfies its burden, the non-moving party must then produce specific evidence proving the existence of a genuine dispute of fact for trial. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986).

While the Court must view the evidence in the light most favorable to the non-moving party, the non-moving party must do more than merely show the existence of some "metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986) (citation omitted). Rather, the non-moving party must present specific facts proving

4

that a genuine factual dispute exists by "citing to particular parts of the materials in the record" or by "showing that the materials cited do not establish the absence . . . of a genuine dispute . . . ." Fed. R. Civ. P. 56(c)(1). "The mere existence of a scintilla of evidence in support of the [non-moving party's] position will be insufficient" to overcome summary judgment. *Anderson*, 477 U.S. at 252.

### 1. *Breach of Contract to Purchase the Enzo*

Cogan Imports asserts that Dharod breached the parties' contract, which consists entirely of the March 11 Emails. "To prove a breach of contract, the complainant must establish three things: 1) existence of a contract; 2) breach of that contract; and 3) damages flowing from the breach of contract." *Metro Louisville/Jefferson Cty. Gov't v. Abma*, 326 S.W.3d 1, 8 (Ky. App. 2009) (citing *Barnett v. Mercy Health Partners-Lourdes, Inc.*, 233 S.W.3d 723, 727 (Ky. App. 2007)).

The disputed contract involves the sale of goods, so the transaction is governed by Kentucky's enactment of Article 2 of the Uniform Commercial Code ("UCC"), KRS 355.2-101 to 355.2-725. *See Princesse D'Isenbourg Et Cie Ltd. v. Kinder Caviar, Inc.*, No. 3:09-29-DCR, 2011 WL 720194, at *4 (E.D. Ky. Feb. 22, 2011); *A&A Mech., Inc. v. Thermal Equip. Sales, Inc.*, 998 S.W.2d 505, 509 (Ky. App. 1999). Under the UCC, "[a] contract for sale of goods may be made in any manner sufficient to show agreement, including conduct by both parties which recognizes the existence of such a contract." KRS 355.2-204(1).[3]

"The fundamental elements of a valid contract are 'offer and acceptance, full and complete terms, and consideration.'" *Energy Home, Div. of S. Energy Homes, Inc. v. Peay*, 406 S.W.3d

---

[3] [A]n 'agreement to sell' is a binding commitment that has not yet been consummated by the exchange of goods for consideration, that is, the 'sale' itself." 77A C.J.S. *Sales* § 1 (Mar. 2019) (quoting *Corus Staal BV v. United States*, 502 F.3d 1370, 1376 (Fed. Cir. 2007)).

828, 834 (Ky. 2013) (quoting *Commonwealth v. Morseman*, 379 S.W.3d 144, 149 (Ky. 2012)). Ordinarily, a valid contract must describe the parties' obligations in sufficiently definite and certain terms. *Kovacs v. Freeman*, 957 S.W.2d 251, 254 (Ky. 1997). As a sister court has explained:

> The content, oral or written, must detail adequately the material or "essential" terms on which the parties purportedly have agreed. By and as part of the agreement, the parties must themselves sufficiently point to the standards for measuring the fulfillment and boundaries of each material item. As it relates to the key issue of open material terms and prospective negotiation, Kentucky takes an all or nothing approach to contracting. Thus, while the modern contracting trend would enforce a preliminary agreement that essentially binds the parties to good faith negotiations on open terms, Kentucky treats a preliminary agreement—even one evincing intent to be bound—as unenforceable if material terms remain subject to future or further negotiation."

*First Tech. Capital, Inc. v. JPMorgan Chase Bank, N.A.*, 53 F. Supp. 3d 972, 984 (E.D. Ky. 2014) (citing *Cinelli v. Ward*, 997 S.W.2d 474, 478 (1998)).

The UCC, however, takes a liberal view on the requirement that a contract must be specific regarding essential terms, including the identity of the parties, the subject matter of the contract, consideration, quantity, and even price. *See* 77A C.J.S. *Sales* § 26. Although the UCC allows for some open contract terms and provides "gap-fillers" where parties have failed to agree on others, it also makes clear that the parties to a contract must express their intent to be bound. KRS 355.2-204(3) ("Even though one (1) or more terms are left open a contract for sale does not fail for indefiniteness if the parties have intended to make a contract and there is a reasonably certain basis for giving an appropriate remedy.").

While the UCC requires an expression of the parties' intent to form a contract, it does not define what words or actions constitute intent. *Compare* KRS 355.2-204(3), *with* KRS 355.2-106. Further, when Kentucky adopted the UCC the legislature included a provision stating that, where not specifically defined by the UCC, Kentucky's common law would govern interpretation. KRS

6

355.1-103(2). Thus, Kentucky common law must answer whether the parties intended to enter into a contract in this case.

The Court's review of the putative contract "must begin with an examination of the plain language of the instrument." *Ky. Shakespeare Festival, Inc. v. Dunaway*, 490 S.W.3d 691, 694 (Ky. 2016). "'In the absence of ambiguity, a written instrument will be enforced strictly according to its terms,' and a court will interpret the contract's terms by assigning language its ordinary meaning and without resort to extrinsic evidence." *Wehr Constr., Inc. v. Assurance Co. of Am.*, 384 S.W.3d 680, 687 (Ky. 2012) (quoting *Frear v. P.T.A. Indus, Inc.*, 103 S.W.3d 99, 106 (Ky. 2003)). Absent ambiguity, the contract terms are to be enforced in accordance with their ordinary meaning without resort to extrinsic evidence. *See Frear*, 103 S.W.3d at 106 (citing *Hoheimer v. Hoheimer*, 30 S.W.3d 176, 178 (Ky. 2000); *Mounts v. Roberts*, 388 S.W.3d 117, 119 (Ky. 1965)). A contract is ambiguous when a reasonable person would find it susceptible to different or inconsistent interpretations. *See id.*

As a preliminary matter, the parties dispute what constitutes the language of the agreement. Cogan Imports takes the position that the contract should be limited to one sentence in Fox's March 11 email: "We would like to offer you $2.7 million for the Enzo." (Mar. 11 Emails, at 4). Further, Cogan Imports' version of the "contract" would exclude Fox's further statement that, if the price was agreeable to Cogan, Fox and Dharod would come to Louisville and "spend a day going over details on that vehicle and other opportunities." (Mar. 11 Emails, at 4). In fact, Plaintiff's counsel candidly admitted at oral argument that Cogan Imports' position is that the contract includes only the first-quoted sentence. (Mot. Hr'g Tr. 6:7-8:8, DN 87).

This argument is without merit. It is well established that a contract must be construed as a whole, giving effect to all parts and every word where possible. *See, e.g.*, *Big Sandy Co., L.P. v.*

7

*EQT Gathering, LLC*, 545 S.W.3d 842, 845 (Ky. 2018); *City of Louisa v. Newland*, 705 S.W.2d 916, 919 (Ky. 1986); *Cantrell Supply, Inc. v. Liberty Mut. Ins. Co.*, 94 S.W.3d 381, 385 (Ky. App. 2002) *Am. Dairy Queen Corp., Inc. v. Fortune Street Research & Writing Inc.*, 753 F. Supp. 2d 675, 679 (W.D. Ky. 2010). Therefore, the Court will interpret the emails as a whole, giving effect to all parts, rather than myopically constricting its view to one sentence.

The next issue is whether Fox's statement concerning spending a day "going over the details on that vehicle and other opportunities" is reasonably susceptible to multiple interpretations. This is a close call. While it seems unlikely that a reasonable person would conclude that Fox was offering to pay $2.7 million for a pig in a poke, it is conceivable that buyers and sellers of exotic luxury automobiles may not engage in the same purchasing practices as ordinary persons.

It is not necessary, however, to discern an ambiguity to resolve the pending motions. As noted above, to assert a breach of contract claim, a plaintiff must prove damages. *Abma*, 326 S.W.3d at 8. Cogan Imports in this instance has requested only that the Court order specific performance—i.e., order Dharod to pay Cogan Imports $2.7 million and accept delivery of the vehicle and confirmed this position in its response. (Pl.'s Answers Def.'s Interrogs. 1-6, DN 59-25; Pl.'s Resp. 26-27). Finally, when the Court held a hearing on this motion and sought confirmation from Cogan Imports on the issue, it again advised that it was seeking only specific performance. (Mot. Hr'g Tr. 9:17-18).

With respect to the remedy of specific performance, the UCC provides that "[s]pecific performance may be decreed where the goods are unique or in other proper circumstances."[4] KRS

---

[4] While this statute is entitled "Buyer's right to specific performance or replevin," the Court cannot infer any significance from the title alone. As the Kentucky Supreme Court has stated, "the title

8

355.2-716(1).  *Id.*  Section 2-716, however, is clearly a buyer's remedy: "[t]his section is intended to give the **buyer** rights to the goods comparable to the seller's rights to the price."  KRS 355.2-716 cmt. 4 (emphasis added).  Cogan Imports has not identified, nor can the Court locate, a single case from Kentucky or any other jurisdiction where a court has ordered specific performance as a seller's remedy under a contract for the sale of goods.

The concept of specific performance is premised on the notion that under some circumstances, one seeking to enforce an agreement cannot be fairly compensated by money because the object of the bargain is unique.  In Kentucky, parcels of land are deemed unique and thus courts have ordered specific performance of valid contracts for the sale of real estate.  *See Billy Williams Builders & Developers, Inc. v. Hillerich*, 446 S.W.2d 280, 282 (Ky. 1969) ("In a proper case there can be little doubt that one may be entitled to the specific performance of a contract to purchase real estate and damages for delay in performance." (citation omitted)).  In the present case, however, the object of Cogan Imports' desire is not unique—it wants $2.7 million in U.S. currency.  Because there is nothing special about the cash consideration flowing to Cogan Imports as its benefit of the purported bargain with Dharod, specific performance is not an appropriate remedy.  *See Hoffmann v. Sprinchorn*, No. 95-CV-0579E(Sc), 1997 WL 128352, at *4 (W.D.N.Y. Mar. 13, 1997) (granting specific performance to a **buyer** of a rare Duesenberg J Murphy automobile).

Cogan Imports also seeks relief under KRS 355.2-709.  (2d Am. Compl. ¶ 21).  In relevant part, this statute provides:

> When the buyer fails to pay the price as it becomes due the seller may recover, together with any incidental damages under KRS 355.2-710, the price

---

of any statute . . . should not be used as an aid in its interpretation."  *Wheeler & Clevenger Oil Co. v. Washburn*, 127 S.W.3d 609, 613 n.10 (Ky. 2004) (emphasis omitted) (internal citation omitted).

(a) of goods accepted or of conforming goods lost or damaged within a commercially reasonable time after risk of their loss has passed to the buyer; and

(b) of goods identified to the contract if the seller is unable after reasonable effort to resell them at a reasonable price or the circumstances reasonably indicate that such effort will be unavailing.

KRS 355.2-709(1). Neither requirement of the statute applies here. The Enzo was neither accepted by Dharod, nor was it lost or damaged after the risk of loss had passed to the buyer. Likewise, Cogan Imports has not presented evidence that it made any reasonable effort to sell the Enzo. To the contrary, as Dharod notes, Cogan candidly admitted in deposition that no efforts were made to sell the Enzo. (Def.'s Mem. Supp. Mot. Summ. J. 29, DN 59-1 (citation omitted)). While the Ferrari may be rare, there is a market for exotic cars, and the remedy provided for by KRS 355.2-709(1)(b) is generally only available when there is no market for the resale of the goods. *See, e.g., Granvia Trading Ltd. v. Sutton Creations, Inc.*, No. 08 Civ. 580(LBS), 2010 WL 4630266, at *5 (S.D.N.Y. Nov. 11, 2010) ("[I]n cases of specialized goods the party seeking recovery is still required to demonstrate that the goods had 'no value to other buyers.'" (quoting *Emanuel Law Outlines, Inc. v. Multi-State Legal Studies, Inc.*, 899 F. Supp. 1081, 1089 (S.D.N.Y. 1995))); *Indeck Energy Servs., Inc. v. NRG Energy, Inc.*, No. 03 C 2265, 2004 WL 2095554, at *12 (E.D. Ill. Sept. 16, 2004) ("Where goods are manufactured to a purchaser's unique specifications, courts routinely apply section 709(1)(b) and measure damages by the contract price."). Cogan Imports purchased the Enzo at auction, and it has presented no explanation that it could not now sell the vehicle in a similar fashion. In the absence of any effort to try to resell, the Enzo, Cogan Imports is not entitled to relief under KRS 355.2-709(1)(b). As one treatise notes, "the [UCC] drafters have generally denied the price to a seller of goods not yet accepted because he is usually in the business of selling goods of the kind in question, is likely to have better market contacts, and is

therefore in a better position to salvage by redisposing of the goods through his normal channels." James J. White & Robert S. Summers, *Uniform Commercial Code* 332-33 (3d ed.1988).

In this instance, Cogan Imports trades in luxury automobiles and yet has not demonstrated any significant effort to sell the vehicle in dispute. Its motivation is transparent: if Cogan Imports were to sell the car for more than Dharod's offer, it would have no claim. Selling the car for less than the offer would establish contract damages, but as discussed above, there is certainly no guarantee that Cogan Imports would prevail on its claim that Fox's email constituted an unconditional offer to purchase a car for $2.7 million, sight unseen. Finally, proving through appraisals or other expert testimony that the Enzo was worth less than $2.7 million could impair Cogan Imports' future efforts to sell the car. Two results of this strategy are now established: (i) Cogan Imports has waived any claim for contract damages; and (ii) specific performance is not an available remedy to the seller under the circumstances of this case. *W. Ky. Coal Co. v. Nourse*, 320 S.W.2d 311, 314 (Ky. 1959). The Court will not order specific performance, and because Cogan Imports has failed to demonstrate any actual damages, Defendant's Motion for Summary Judgment will be granted.

### 2. *Breach of the Settlement Agreement*

The Second Amended Complaint contains an additional claim alleging a breach by Dharod of the Settlement Agreement. (2d Am. Compl. ¶¶ 9-20). Cogan Imports alleges that under the terms of the Settlement Agreement Dharod would pay $2.5 million for the Enzo subject to an in-person inspection in Louisville. (2d Am. Compl. ¶¶ 11-13). The Settlement Agreement provided that if Dharod approved of the Enzo upon inspection, then the purchase could proceed to closing, but if he did not, litigation would resume. (2d Am. Compl. ¶ 13).

Although the Settlement Agreement clearly seemed to grant Dharod the option to cancel the sale even at the lower price and return the parties to their relative positions, there is no need to address Cogan Imports' claim that Dharod breached the Settlement Agreement by canceling the purchase without ever inspecting the vehicle. (2d Am. Compl. ¶¶ 17-20). Regardless of any breach, however, the same outcome must prevail because Cogan Imports has shown no damages from the claimed breach of the Settlement Agreement. (Mot. Hr'g Tr. 22:23-25). The discussion above with respect to Cogan Imports' chosen remedy for breach of the initial contract prevails: It is not entitled to specific performance and has waived any claim for damages. For these reasons, the claim for breach of the Settlement Agreement must likewise be dismissed.

### B. **Plaintiff's Motion to Exclude Defendant's Expert Witness (DN 52)**

Plaintiff has also moved to exclude Dharod's expert witness. Because the Court did not rely on the opinions of the challenged expert witness in ruling on the summary judgment motions, the Court will deny this motion as moot.

### C. **Defendant's Objection to Magistrate Judge's Order (DN 82)/Defendant's Objection to Plaintiff's Bill of Costs (83)**

Dharod has also objected to the Magistrate Judge's order awarding costs and fees as a discovery sanction, as well as Cogan Imports' bill of costs. Dharod objects to the Magistrate Judge's award of costs and fees as a discovery sanction. (Def.'s Obj. Order Pl.'s Renewed Mot. Sanctions, DN 82 [hereinafter Def.'s Obj.]; Def.'s Obj. Pl.'s Bill of Costs 1-7, DN 83). District courts may reconsider a non-dispositive pretrial order rendered by a magistrate judge "where it has been shown that the magistrate's order . . . is clearly erroneous or contrary to law." 28 U.S.C. § 636(b)(1)(A); Fed. R. Civ. P. 72(a). "A finding is 'clearly erroneous' when although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed." *United States v. U.S. Gypsum Co.*, 333 U.S. 364,

395 (1948). "A determination is contrary to law if the magistrate judge misinterpreted or misapplied applicable law." 14 James Wm. Moore et al., *Moore's Federal Practice*, § 72.11[1][b] (Matthew Bender 3d ed. 2017) (citations omitted)). "A magistrate judge's order on a non-dispositive matter 'should draw great deference, as the 'clearly erroneous' and 'contrary to law' standards of review present a sizeable burden for a district court to overcome.'" *Warren v. Sheba Logistics, LLC*, No. 1:15-CV-00148-GNS-HBB, 2017 WL 1227940, at *2 (W.D. Ky. Mar. 31, 2017) (citation omitted).

### 1. *Conduct Leading to Plaintiff's First Motion for Sanctions*

The discovery dispute began with a telephonic conference on February 13, 2018. (Order Regarding Telephonic Conference, DN 46). The Magistrate Judge ordered as follows:

> Each party shall produce to the other those communications (internal or external) that relate to negotiations for the purchase or sale of any exotic/vintage automobile by the party, purchase or sales agreements of the party involving such automobiles, insurance declaration pages related to each of the affected automobiles sold or purchased within the relevant five years. The Plaintiff's duty of production is further limited to no more than up to 10 qualifying automobiles during the applicable five-year time period. The parties are further advised that the critical date for application of the five-year period is the date of sale or purchase of each qualifying automobile and that communications regarding a qualifying automobile that otherwise fall outside the five-year period remain discoverable."

(Order Regarding Telephonic Conference 1).

Thirty days after the first order, Defendant's counsel contacted Plaintiff's counsel and instructed that Defendant's counsel planned to get the documents in his hands the next day and promised delivery to Plaintiff's counsel sometime early the following week. (Order Pl.'s Renewed Mot. Sanctions 3, DN 79). Six days later, Cogan Imports had not yet received responsive documents from Dharod and moved for sanctions. (Pl.'s Mot. Sanctions, DN 49).

On the same day Cogan Imports moved for sanctions, Defendant's counsel hand-delivered the responsive documents. (Order Pl.'s Renewed Mot. Sanctions 3). This prompted Cogan

Imports to supplement its motion for sanctions in order to take issue with the timeliness of Dharod's compliance with the Court's original order and to raise objections to his assertion of boilerplate objections. (Pl.'s Suppl. Mot. Sanctions, DN 50).

Dharod responded that the Court's February 13 order did not establish a specific deadline for responding to the discovery request, and moreover, Defendant's counsel had contacted Plaintiff's counsel six days before delivering the responsive material to inform him of the upcoming delivery. (Def.'s Resp. Pl.'s Mot. Sanctions, DN 51). The Court issued an order denying Cogan Imports' motion without prejudice on June 11, 2018. (Order Pl.'s Mot. Sanctions 7, DN 73). The Court agreed it had not established a specific deadline, but because it had not, the thirty-day deadline from Fed. R. Civ. P. 34(b)(2)(A) governed. (Order Pl.'s Mot. Sanctions 2). Additionally, the Court noted that Dharod's boilerplate objections were waived because he was raising them at such a late time in the process. (Order Pl.'s Mot. Sanctions 6).

The Court then noted it could not tell what documents, if any, were being withheld. (Order Pl.'s Mot. Renewed Sanctions 4). The Court ordered Cogan Imports to produce a list of documents it alleged had not been produced within five days, gave Dharod five days to respond, and gave the parties five days to confer in the event Cogan Imports still believed discovery was missing. (Order Pl.'s Renewed Mot. Sanctions 4; Order Pl.'s Mot. Sanctions 8). If Cogan Imports was still dissatisfied at that point, it could renew its motion for sanctions. (Order Pl.'s Mot. Sanctions 8). Notably, the Magistrate Judge did not find it appropriate to award Cogan Imports any costs or fees for any effort expended in bringing the original motion for sanctions.

### 2.  *Conduct Leading to Plaintiff's Renewed Motion for Sanctions*

Complying with the Magistrate Judge's order, Cogan Imports produced a letter to Dharod outlining nine categories of documents it believed he was still improperly withholding. (Order

14

Pl.'s Renewed Mot. Sanctions 8 (citing Pl.'s Deficiency Letter, DN 74-8)). These documents all concerned Cogan Imports' attempts to obtain evidence of Dharod's prior negotiations for the purchase of exotic luxury automobiles.

The Magistrate Judge found three documents particularly significant. First, two emails between Envar Kaba ("Kaba") and Dharod appeared to have attachments which were not produced. (Order Pl.'s Renewed Mot. Sanctions 9). Kaba, a general sales manager at Boardwalk Ferrari, sent Dharod an email with an attachment icon and a message stating that options for a Ferrari 458 Spider were attached. (Order Pl.'s Renewed Mot. Sanctions 9-10). Cogan Imports claimed the attachment was never produced. A second similar email from Kaba stated that the latest price on the Ferrari Spider was attached. (Order Pl.'s Renewed Mot. Sanctions 10). Cogan Imports again claimed no attachment had been produced. Finally, an email from Dharod's agent asked him to quote a price on a particular vehicle. (Order Pl.'s Renewed Mot. Sanctions 10). No response accompanied the question, however.

The Magistrate Judge concluded the evidence permitted a conclusion that documents had been withheld. (Order Pl.'s Renewed Mot. Sanctions 9-10). The Magistrate Judge further noted that Dharod failed to address these specific documents in his response. (Order Pl.'s Renewed Mot. Sanctions 10 (citing Def.'s Resp. Pl.'s Renewed Mot. Sanctions Ex. 1, DN 76-1)). On the other hand, the Magistrate Judge noted that Cogan Imports could have mitigated certain costs by conferring with Dharod prior to filing its first motion for sanctions and by identifying the specific inconsistencies and omissions in the June 15, 2018, letter to Dharod. (Order Pl.'s Renewed Mot. Sanctions 14). The Magistrate Judge therefore ordered Dharod to either produce these documents or explain why they had not been produced and awarded Cogan Imports its costs and fees

associated only with the filing of the second motion for sanctions. (Order Pl.'s Renewed Mot. Sanctions 14).

### 3. *Defendant's Objections*

Dharod timely submitted a responsive document to the Magistrate Judge's Order. (Def.'s Compliance with Magistrate Judge's Order, DN 80 [hereinafter Def.'s Compliance]). Dharod stated that, with respect to the attachment containing options for a Ferrari Spider, that the attachment had not been produced contemporaneously with the email but had in fact already been produced. (Def.'s Compliance 1-2). As for the other attachment that had allegedly not been produced, Dharod stated that the email did not actually contain an attachment icon and confirmed that an additional search revealed that, while the email stated a document was attached, no document was in fact attached. (Def.'s Compliance 3-4). Finally, Dharod stated that the third email that appeared to be missing a responsive correspondence containing a price quote did not exist because there was no responsive email. (Def.'s Compliance 4-5).

In his Objection, Dharod first argues the Magistrate Judge's ruling requires reversal because the documents the Magistrate Judge identified as potentially having been withheld were not specifically identified in Cogan Imports' deficiency letter. (Def.'s Obj. 6-7). This argument is without merit. The original order instructed Cogan Imports to produce a letter discussing both categories of documents and specific documents. (Order Pl.'s Mot. Sanctions 7-8). The documents Cogan Imports identified fit the defined categories relating to negotiations for purchase and sale of the relevant vehicles. More importantly, however, even if Dharod did not know about these three specific documents when preparing his response to Cogan Imports' deficiency letter, he certainly knew about them when Cogan Imports renewed its motion for sanctions because it detailed the exact documents at issue. (Pl.'s Renewed Mot. Sanctions 11-15).

Dharod's argument that he could not have known that Cogan Imports was seeking those three specific documents earlier reflects the gamesmanship that apparently plagued discovery in this case. Dharod could have but did not bring facts stated in his compliance document (DN 80) to the Court's attention when responding to Cogan Imports' second motion for sanctions. Having realized his error, Dharod has attempted to end-run the Magistrate Judge's decision by presenting the facts and arguments it should have raised in its response for the first time in his Objection.

Absent compelling reasons, a party may not raise new arguments in its objection to a Magistrate Judge's order. *See United States v. Waters*, 158 F.3d 933, 936 (6th Cir. 1998). No compelling reason merits considering Defendant's arguments for the first time on objection. Defendant's Objection is therefore overruled, and the Court adopts the conclusion reached by the Magistrate Judge.

### 4. *Defendant's Objections to Plaintiff's Bill of Costs*

Cogan Imports submitted a bill outlining its costs and fees in response to the Magistrate Judge's order (DN 81), to which Dharod timely objected (DN 83). Much of Defendant's Objection to Plaintiff's Bill of Costs is spent restating its position expressed in Defendant's Objection to the Magistrate Judge's order. (Def.'s Obj. Pl.'s Bill of Costs 1-7). The Court addressed these arguments above and will turn directly to the reasonableness of Cogan Imports' fee request.

Determining the imposition and extent of Rule 37 sanctions is committed to the sound discretion of the trial court. *Taylor v. Medtronics, Inc.*, 861 F.2d 980, 985 (6th Cir. 1988). Cogan Imports has requested compensation for 1.3 hours at a rate of $500 per hour for Attorney Cox ("Cox"), 61.3 hours at $330 per hour for Attorney Mooney ("Mooney"), and 0.4 hours at $125 per hour for Paralegal Hamilton ("Hamilton"). (Cox Decl. 2-6, DN 81-1). The Court concludes the hourly amount requested by Cogan Imports is reasonable for each of the three professionals.

The next issue is determining how many hours represents a reasonable fee and a just sanction. Doing so requires reference to the Magistrate Judge's orders addressing both motions. The first order prescribes a course of conduct that the Court intended to resolve the matter without imposing sanctions. (Order Pl.'s Mot. Sanctions 7-8). Cogan Imports has attempted to bill for its time spent complying with that Court's order. The Court concludes that, had the Magistrate Judge wished Cogan Imports to bill for the time spent complying with its order, the Magistrate Judge would have so stated. Support for this conclusion is bookended by the second order which orders Cogan Imports to submit a bill of costs detailing only the fees associated with filing its renewed motion for sanctions. (Order Pl.'s Renewed Mot. Sanctions 15). Thus, the Magistrate Judge intended Cogan Imports to submit a bill only for time spent filing its renewed motion for sanctions.

The first reference to the renewed motion comes on June 25, 2018. (Cox Decl. 9). Neither Cox nor Hamilton spent any time in June working on matters related to the renewed motion for sanctions. Mooney billed for a total of 10.5 hours in June relating to the renewed motion. (Cox Decl. 9).

In July, Mooney billed for a total of 20.4 hours on the renewed motion. (Cox Decl. 10-12). Cox billed for a total of 0.3 hours. In August, Mooney claims to have spent 17.3 hours drafting the reply to the motion for sanctions. (Cox Decl. 14-15). This totals 48.2 hours for Mooney, 0.3 hours for Cox, and no time for Hamilton.

Dharod suggests that Mooney's claimed time spent drafting the motion for sanctions and reply is exorbitant. The Court concludes that the number of hours is reasonable, but other factors suggest the award should be reduced. For one thing, Dharod did not act in bad faith. (Order Pl.'s Renewed Mot. Sanctions 12). More importantly, Cogan Imports could have reduced any prejudice it suffered by conferring with Dharod before filing its initial motion to compel and by specifically

identifying the documents at issue in the June 15 deficiency letter. (Order Pl.'s Renewed Mot. Sanctions 13).

Finally, while the Court previously refused to consider Cogan's declaration submitted to comply with the Magistrate Judge's second order (DN 80), it will weigh that information when considering for the first time Defendant's objection to the fee amount. The functional result of Cogan Imports' renewed motion for sanctions is the knowledge that one of the documents forming the basis of its motion had already been produced to it, the second document was an attachment that turned out not to have been sent, and the third document was never in Dharod's custody or control. While never addressed by the Sixth Circuit, the Tenth Circuit has held that in the absence of bad faith courts should draw a nexus between a party's noncompliance with the rules and the amount of fees awarded. *Turnbull v. Wilcken*, 893 F.2d 256, 259 (10th Cir. 1990) (discussed as *dictum* in *Polanski v. Detroit Police*, No. 85-1503, 1986 WL 17175, at *3 (6th Cir. June 6, 1986)).

As discussed in detail above, the Magistrate Judge's orders have identified the various ways Dharod has been noncompliant but in each instance no bad faith was found, no evidentiary sanctions were issued, and it was suggested that Cogan Imports could have conferred with Dharod before filing its motions for sanctions. As a result, the Court concludes as follows: Dharod will be required to pay Cogan Imports for 48.2 hours of Mooney's time at $330 per hour and 0.3 hours of Cox's time at $500 per hour, which totals $16,056. Because of the absence of bad faith and the relative insignificance of the information not provided timely, the Court will additionally reduce this amount by 50%, resulting in a total of $8,028.

## IV. CONCLUSION

For the reasons set forth above, **IT IS HEREBY ORDERED** as follows:

1. Plaintiff's Motion for Summary Judgment (DN 53) is **DENIED**;

2. Defendant's Motion for Summary Judgment (DN 59) is **GRANTED**;

3. Plaintiff's Motion to Exclude Defendant's Expert Witness (DN 52) is **DENIED AS MOOT**;

4. Defendant's Objection to the Magistrate Judge's Order on Motion for Sanctions (DN 82) is **OVERRULED**; and

5. Defendant's Objection to Plaintiff's Bill of Costs (DN 83) is **SUSTAINED**, and Defendant is ordered to pay Plaintiff the amount of $8,028.00 in sanctions.

Greg N. Stivers, Chief Judge
United States District Court

August 2, 2019

cc: counsel of record